

**U.S. BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**

# ENTERED

**TAWANA C. MARSHALL, CLERK**
**THE DATE OF ENTRY IS**
**ON THE COURT'S DOCKET**

The following constitutes the ruling of the court and has the force and effect therein described.

Signed September 30, 2014

_____
**United States Bankruptcy Judge**

_____

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## AMARILLO DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| American Housing Foundation, | § | Case No.:  09-20232-RLJ |
| | § | |
| Debtor. | § | |
| | § | |
| ——————————————— | § | ——————————————— |
| | § | |
| Walter O'Cheskey, Trustee of the AHF Liquidating Trust | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Adversary No. 11-02130-RLJ |
| | § | |
| Herring National Bank, et. al., | § | |
| | § | |
| Defendants. | § | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Commencing on January 14, 2014, and continuing on January 27–28, 2014, February 24–25, 2014, March 24–25, 2014, April 28–29, 2014, and June 3, 2014, the Court conducted a trial in the above-captioned adversary proceeding.  Appearing at trial were counsel for Walter O'Cheskey, Trustee of the AHF Liquidating Trust ("Trustee"), counsel for Herring National Bank ("Herring Bank"), and other appearances as noted in the record.  The Court has reviewed and considered the arguments of counsel, the testimony of witnesses, the exhibits admitted into evidence at trial, and the documents and pleadings filed in connection with the adversary.  Based upon the record, the Court now finds and concludes as follows, pursuant to Rule 52 of the Federal Rules of Civil Procedure, made applicable in the adversary by Federal Rule of Bankruptcy Procedure 7052.

## I.    FINDINGS OF FACT

### AHF Bankruptcy

1.    On April 21, 2009, certain alleged creditors of American Housing Foundation ("AHF" or the "Debtor") filed an involuntary petition against the Debtor pursuant to chapter 11 of the Bankruptcy Code, thereby initiating an involuntary bankruptcy case [Case No. 09-20232] (the "Involuntary Case") against the Debtor.  On June 11, 2009, the Debtor filed a voluntary petition pursuant to chapter 11 of the Bankruptcy Code, initiating a voluntary case [Case No. 09-20373] (the "Voluntary Case").

2.    On July 17, 2009, the Court entered its *Agreed Order Granting Motion to Consolidate Bankruptcy Cases* [Docket No. 88; Case No. 09-20232], consolidating the Voluntary Case and the Involuntary Case into a single case pursuant to Bankruptcy Rule 1015(a).

3.      On April 29, 2010, this Court entered the *Order Approving Appointment of Chapter 11 Trustee* [Docket No. 1104; Case No. 09-20232].

4.      On December 8, 2010, this Court entered its *Findings of Fact, Conclusions of Law, and Order Confirming Second Amended Joint Chapter 11 Plan Filed by the Chapter 11 Trustee and the Official Committee of Unsecured Creditors* [Docket No. 1918; Case No. 09-20232] (the "Confirmation Order"), confirming the *Second Amended Joint Chapter 11 Plan Filed by the Chapter 11 Trustee and the Official Committee of Unsecured Creditors* [Docket No. 1909; Case No. 09-20232] (the "Plan").

### The Adversary Proceeding

5.      On June 9, 2011, the Trustee filed *Trustee's Complaint to Avoid Guarantees as Fraudulent Obligations, to Subordinate Allowed Claims, and to Avoid and Recover Fraudulent and Preferential Transfers, Together with Objections to Claims of Herring Bank and Vaudrey Capital* [Docket No. 1].

6.      On April 19, 2012, the Trustee filed *Trustee's First Amended Complaint to Avoid Guarantees as Fraudulent Obligations, to Subordinate Allowed Claims, and to Avoid and Recover Fraudulent and Preferential Transfers, Together with Objections to Claims of Herring Bank and Vaudrey Capital* [Docket No. 35].

7.      On May 21, 2012, Defendants filed their *Original Answer and Counterclaim for Declaratory Judgment to Trustee's First Amended Complaint* [Docket No. 38].

8.      On June 11, 2012, the Trustee filed *Trustee's Answer to Counterclaim* [Docket No. 39].

9.      On November 8, 2012, a status conference was held in this adversary, and the Court determined that this case should be abated until further notice of the Court. *See Omnibus*

*Scheduling Order* [Docket No. 43].

10.    On May 10, 2013, the Trustee filed *Trustee's Motion to Unabate and to Enter Scheduling Orders and Set Trial Dates* [Docket No. 45]. This motion was granted on May 21, 2013 [Docket No. 46].

11.    On July 24, 2013, the Court issued an *Order Regarding Adversary Proceedings Trial Setting and Alternative Scheduling Order* which set this case for trial [Docket No. 61].

**Herring Bank Claims and Trustee's Objections and Avoidance Actions**

12.    Herring Bank filed its original proof of claim in the AHF bankruptcy case on October 6, 2009 [Claim No. 97-1, Case No. 09-20232], asserting a general unsecured claim in the aggregate amount of $6,211,547.16. This amount represents three transactions:

(1)    $2,070,395.07 arising from a $2,000,000 loan made by Herring Bank to AHF (the "AHF Loan Claim");

(2)    $1,963,226.05 arising from a $1,505,000 equity investment in LIHTC Barrington-Bell Plaza Development, Ltd. (the "Barrington-Bell Claim"); according to the proof of claim, AHF guaranteed the return of the equity investment, plus 12% interest (the "Barrington-Bell Guaranty"); and

(3)    $2,177,926.04 arising from a $2,000,000 loan to LIHTC River Falls-Three Fountains Development, Ltd. (a shell partnership 25% owned by Vaudrey Capital Corp., a Burgess affiliate) allegedly guaranteed by AHF (the "River Falls Claim" and the "River Falls Guaranty").

13.    Herring Bank amended its claim amount by its amended proof of claim filed on November 19, 2010, reflecting an aggregate unsecured claim of $5,814,542.16 [Claim No. 97-2, Case No. 09-20232]. The amended claim reflects a credit of $397,005 that, per the claim, was applied pro rata against the River Falls Claim and the Barrington-Bell Guaranty.

14.    The Trustee has objected to Herring Bank's proof of claim to the extent it is based on the Barrington-Bell Claim and the River Falls Claim (collectively, the "Herring Bank Claims"). He does not object to the AHF Loan Claim.

15.    The Trustee further alleges that approximately $3,000,000 in payments made to Herring Bank over the two-plus years prior to AHF's bankruptcy filing are voidable transfers under the Bankruptcy Code.

### Herring Bank and the Burgess Family

16.    Herring Bank is wholly owned by Herring Bancorp, Inc. Over 75% of the ownership interests in Herring Bancorp, Inc. benefit the Burgess Family. This is effected, principally, through trusts of which specific family members are the sole beneficiaries. *See* Trustee's Exhibit 100.

17.    The Burgess family, through C.C. Burgess and Campbell Burgess, control the following entities: Herring Bank, Herring Financial Services, Inc., Vaudrey Capital, L.P., Chain-C, Inc., Banjo, Inc., Burgess Trust No. 4, and other Burgess trusts[1] (collectively the "Burgess Related Parties"). The Burgess Related Parties filed claims in the AHF bankruptcy case that were later withdrawn. According to counsel, the claims were withdrawn as a result of the Court's ruling in the *Templeton* adversary [*O'Cheskey v. Templeton (In re Am. Hous. Found.)*, No. 10-02016, 2013 WL 1316723 (Bankr. N.D. Tex. Mar. 30, 2013), *aff'd*, 2014 WL 1599929 (N.D. Tex. Apr. 11, 2014)]. The "claims" at issue in *Templeton* were recharacterized as equity interests.

18.    Vaudrey Capital, L.P. was also a party defendant in this adversary proceeding. Vaudrey Capital is owned by two Burgess trusts—the Louise Johnson Thomas Trust and the Cornelia Johnson Slemp Trust—of which Herring Bank is the trustee. Jane Slemp Burgess, wife of C.C. Burgess, is the beneficiary of these two trusts.

---

[1] Such other trusts include Burgess Trust No. 2, Burgess Trust No. 3, the Louise Johnson Thomas Trust, the Cornelia Johnson Slemp Trust, Jessie Herring Estate Trust No. 1, and Jessie Herring Estate Trust No. 2. *See* Trustee's Exhibit 100.

### The Barrington-Bell Deal

19.      LIHTC Barrington-Bell Plaza Development, Ltd. ("LIHTC Barrington") was formed on March 23, 2005, the date that its Certificate of Limited Partnership was filed with the Secretary of State.

20.      Herring Bank made a capital contribution of $1,505,000 to LIHTC Barrington in exchange for a 25% interest in the partnership.  Its purpose was to provide development and rehabilitation funds for the Barrington and Bell Plaza apartments.

21.      The initial partners were Multi-Family Rehab Partners, as the general partner, holding a 75% interest, and Herring Bank, as the limited partner, holding its 25% interest.

22.      The partners reflected on the 2006 federal income tax return were Multi-Family Rehab Partners, as the general partner, holding a 75% interest, and Herring Bank, as the limited partner, holding a 25% interest.

23.      On or about March 23, 2005, Sterquell, as President of AHF, signed a guaranty which provided that it was a "primary, irrevocable, and unconditional guaranty of *payment* and performance" of LIHTC Barrington's obligation to Herring Bank.  Trustee's Exhibit 210 (emphasis added).

24.      The "payment" required by the guaranty was defined as "Return of Investment within twenty-four (24) months of investment, plus a preferential return of twelve percent (12%) per annum until such amount is paid in full." *Id.*

25.      AHF guaranteed LIHTC Barrington's obligation under Article VI of the LIHTC Barrington Partnership Agreement.  The partnership agreement contained the following provisions:

> -      that the Limited Partner was entitled to a return of its "Initial Capital Contribution" within 24 months, plus a 12% Preferred Return;

- that "Initial Capital Contribution" was defined as contributions made on or before the "Effective Date"; and

- that "Effective Date" was defined as the date of the filing of the certificate of partnership (March 23, 2005).

26.     Herring Bank's "capital contribution" check, dated March 31, 2005, was made payable to AHF for $1,505,000.  The funds were deposited into AHF's checking account entitled "AHF Special Account."  Trustee's Exhibit 209.

27.     By letter dated December 27, 2006, AHF outlines that Herring Bank's equity interest in LIHTC Barrington was "exchanged" for a similar interest in LIHTC Canterbury-Puckett, Ltd.  Trustee's Exhibit 211.

28.     The LIHTC Canterbury-Puckett, Ltd. 2007 and 2008 tax returns reflect Herring Bank as a 25% partner with a $1.505 million capital contribution.  Trustee's Exhibits 214 and 215.

29.     The agreement provided that if the partnership profits were insufficient to make the required payments to Herring Bank, the amounts necessary for repayment would be made by the general partner "from its capital accounts or otherwise."  Trustee's Exhibit 206 ¶ 6.4.

30.     The capital contribution, defined as the "Initial Capital Contribution," was the amount of cash or services contributed prior to the effective date of the partnership.  *Id*. ¶ 1.6(e). The "Effective Date" was defined as the date the certificate of limited partnership was filed with the Secretary of State of Texas.  *Id*.

31.     The $1.505 million was contributed on March 31, 2005.  As, according to the partnership agreement, such amount was payable to Herring Bank within 24 months, it would have been due on March 31, 2007.  *See id*. ¶ 6.2.  The Barrington-Bell Guaranty provided that AHF guaranteed "the performance of the Principal's obligations" under the partnership agreement.  Trustee's Exhibit 210.

32.     LIHTC Barrington failed to pay or return the $1.505 million; it likewise failed to pay the 12% preferential return.  Despite this, in the two years from the stated repayment date to AHF's bankruptcy filing in April 2009, Herring Bank made no demand on LIHTC Barrington or AHF and never initiated any formal action to recover the $1.505 million investment.

33.     The Barrington-Bell deal, relative to the size of the bank and its annual income level, was an extraordinary transaction for the bank.

34.     Campbell Burgess testified that the bank was not especially concerned about the Barrington-Bell investment.  He admitted that had it been a note, the bank would have addressed the default in some formal way by, for example, a renewal, extension, or forbearance agreement.  But this was not done on Barrington-Bell, and further, the bank continued to invest with Steve Sterquell and AHF after the Barrington-Bell contribution came due.  In fact, the River Falls transaction was entered into at approximately the same time as the Barrington-Bell investment supposedly came due.  The bank was then exposed to an amount exceeding $4 million, a massive sum for a bank of Herring Bank's size.  The Court notes, however, that the bank sold off almost 80% of the River Falls note, $1.580 million, to Vaudrey Capital, LP, an entity owned by trusts created for the Burgess family and of which Herring Bank served as trustee.

35.     Burgess could not explain why the bank took no formal action concerning the Barrington-Bell deal.  He simply stated that he could not recall, that the deal was complicated, and that he had confidence in AHF's balance sheet.

### The River Falls Deal

36.     LIHTC River Falls-Three Fountains Development, Ltd. ("LIHTC River Falls") was formed on January 31, 2007.

37.     On March 30, 2007, LIHTC River Falls signed a note for $2,000,000 made

payable to Herring Bank; the note reflects that a loan was made by Herring Bank to LIHTC River Falls for $2,000,000. The note was due September 25, 2008, with interest at 12%. The note was signed by Multi-Family Rehab Partners, as general partner of LIHTC River Falls. The general partners of Multi-Family Rehab Partners were AHF (Steve Sterquell as Executive Director), the Catherine D. Koehler Trust (Catherine D. Koehler, Trustee), the Mary Schooler Trust (Mary Catherine Schooler, Trustee), the Louise Trammell Conley Trust (Louise Trammell Conley, Trustee), Maurice Schooler, Catherine Koehler, Mary Catherine Schooler, and Louise Trammell Conley.

38. In addition to the $2,000,000 note from LIHTC River Falls to Herring Bank, LIHTC River Falls also signed a security agreement in favor of the bank, covering 75 units of partnership interests in LIHTC River Falls.

39. Guaranties of the LIHTC River Falls $2,000,000 note were signed and issued by AHF, Multi-Family Rehab Partners, Steve Sterquell, and others.

40. On the same day that Herring Bank made the "loan" to LIHTC River Falls, Vaudrey Capital (a Burgess affiliate and 5% equity owner in LIHTC River Falls) purchased a 79% interest in the "loan."

41. LIHTC River Falls never owned any hard assets. The River Falls, Canterbury, and Puckett Place apartments that were purportedly owned by LIHTC River Falls were, in reality, purchased from Simpson Properties in 2005 by Amarillo Affordable Housing, LLC, subject to $28 million of mortgage debt (that was in default on December 31, 2006).

42. A Schedule K-1 issued by LIHTC River Falls for the 2007 tax year was issued to Herring Bank reflecting a capital contribution by Herring Bank for 2007 of $2,000,000 and a 20% share of profits, losses, and capital. The 2007 tax return for LIHTC River Falls likewise

lists Herring Bank as a 20% limited partner.

**The Transfers**

43.     The transfers to Herring Bank that are allegedly subject to avoidance fall into four categories: payments by AHF to Herring Bank of promissory notes of Steve Sterquell; payments by AHF to Herring Bank of equity investments made by Herring Bank that are also subject of guaranties from AHF; payments by AHF on loans to so-called "soft money" partnerships that were controlled, directly or indirectly, by AHF (and Steve Sterquell); and payments by AHF to Herring Bank within 90 days of the bankruptcy filing on promissory notes signed by AHF in favor of Herring Bank.  These transfers with the amounts and dates of each are set forth as follows:

I.     AHF Payments of Sterquell Notes

| Loan No. | Original Amount | Dated | AHF Payment | Payment Date |
|---|---|---|---|---|
| 13198 | $500,000 | 12/31/07 | $257,703 | 4/25/08 |
| | | | $253,993 | 7/17/08 |
| 12724 | $250,000 | 3/21/07 | $260,171 | 12/18/07 |
| | | | $771,867 | |

II.     AHF Payments of Equity Investments

| Partnership | Original Amount | Dated | AHF Payment | Payment Date |
|---|---|---|---|---|
| LIHTC Amarillo Gardens Apartments, Ltd. | $1,075,000 | 2005 | $225,838 | 12/27/06 |
| | | | $1,123,066 | 5/13/07 |
| | | | $1,348,904 | |
| LIHTC Barrington-Bell Plaza, Ltd. | $1,505,000 | 3/31/05 | $316,174 | 12/27/06 |
| | | | $1,665,078 | |

III.     AHF Payment of Loans to Soft Money Partnerships

| Partnership | Loan No. | Original Amount | Dated | AHF Payment | Payment Date |
|---|---|---|---|---|---|
| MC-CDC- | 13197 | $2,750,000 | 12/31/07 | $174,935 | 1/16/09 |

SA, LLC

| | | | | | |
|---|---|---|---|---|---|
| LIHTC River Falls-Three Fountains Development, Ltd. | 12514 | $2,000,000 | 3/30/07 | $360,000 $534,925 | 11/24/08 |

IV.    AHF Payments on AHF Notes within 90-day Preference Period

| Loan No. | Original Amount | Dated | AHF Payment | Payment Date |
|---|---|---|---|---|
| 12402 | $2,000,000 | 3/2/07 | $9,042 $9,042 $18,084 | 2/18/09 2/27/09 |
| | | **Grand Total:** | **$2,989,964** | |

*See* Trustee's Exhibit 801.

44.     The payments on the Sterquell Notes, the $771,867 in category I, were made on account of loans made by Herring Bank to Steve Sterquell.  AHF did not guarantee the loans and was not otherwise obligated on such debts.  AHF did, however, sign guaranties of the equity investments of $1,665,078 set forth in category II.

45.     As for the payments in category III, the $174,935 payment to Herring Bank was made on a $2.75 million loan from Herring Bank to MC-CDC-SA, LLC.  AHF held no ownership in this entity and did not guarantee the loan.  The $360,000 payment to Herring Bank in the same category was made on the loan by Herring Bank to the named entity, LIHTC River Falls; AHF held a *de minimis* (less than 1%) interest in LIHTC River Falls, though it also signed a guaranty of the loan.

46.     The two $9,042 payments to Herring Bank were made on a loan from Herring Bank to AHF; they were made within 90 days of the AHF bankruptcy filing.

**Other Burgess Related Transactions**

**A. LIHTC Community Development No. 1, Ltd. / Amarillo GT II, Ltd.**

47. LIHTC Community Development No. 1, Ltd. ("LIHTC No. 1") was formed on July 14, 2006.

48. The Burgess Related Parties acquired 99.99% of LIHTC No. 1 purportedly in exchange for contributing Herring Bank stock or Aegis Value Fund, Inc. shares to the partnership. No shares were contributed, and therefore, the Burgess Related Parties acquired virtually all of the partnership for no consideration.

49. The Burgess Related Parties then wrote checks on July 14, 2006, to AHF Development in the aggregate amount of $450,000; each of the checks recites "For Purchase of [x%] of LIHTC Community Development LTD."

50. Despite the recitation on the checks, LIHTC No. 1 executed promissory notes payable to the Burgess Related Parties for the advances, guaranteed by AHF.

51. Sterquell then gave LIHTC No. 1 a 66.67% interest in Amarillo GT II, Ltd. ("Amarillo GT") for no consideration.

52. Amarillo GT filed a 2006 tax return claiming it gifted two apartment complexes (which it did not own) to Mid-Continent Community Development for an illegitimate $6,837,809 charitable contribution deduction.

53. Amarillo GT gave LIHTC No. 1 a 2006 K-1 allocating $4,558,768 of this deduction to LIHTC No. 1. LIHTC No. 1 then recorded and allocated that deduction in 2006 K-1s to the Burgess Related Parties.

54. C.C. Burgess's 2006 K-1 from LIHTC No. 1 states that he made capital contributions totaling $682,280 to LIHTC No. 1 that year—which he did not—and provided him with a $759,035 charitable contribution deduction (his 16.65% of the $4.5 million deduction by

LIHTC No.1). For LIHTC No. 1 to provide a $759,035 charitable deduction to a 16.65%

owner, it would had to have owned an asset worth $4.558 million and given it away.

55.     Since the Burgess Related Parties owned 99.99% of LIHTC No. 1, one would

assume they would know (i) if their almost wholly owned partnership owned an asset

worth $4.558 million; and (ii) if it were being given away and to whom.   They did not.

56.     LIHTC No. 1 and Amarillo GT were sham entities with no economic substance.

**B.     MC-CDC SA, Ltd. / Clarion Inn**

57.     On November 11, 2004, Herring Bank made a $2.9 million loan secured by a

lien on the Clarion Inn & Suites (the "Clarion Inn") located in San Angelo, Texas.   The

borrower filed bankruptcy.   The Clarion Inn was then vacant and not operating.   In December

2005, Herring Bank filed a motion to modify the stay alleging that the Clarion Inn was worth

less than the $2.9 million debt owed to Herring Bank.   Herring Bank was allowed to foreclose,

and it became the owner of the Clarion Inn.

58.     Herring Bank held the Clarion Inn as "REO"[2] and tried to sell the Clarion Inn

for over one year with no success.

59.     To get the Clarion Inn—then a vacant and non-operating REO property—

off Herring Bank's books, Sterquell caused two new entities to be formed by Mid-Continent

Community Development Corp. ("Mid-Continent").   These entities were

-     MC-CDC-SA, LLC ("MC-CDC-SA") and

-     MC-CDC San Angelo, Ltd. ("MC-CDC San Angelo") which
      owned 100% of MC-CDC-SA.

60.     MC-CDC San Angelo was owned 00.01% by Mid-Continent and 99.99%

by Herring Bank.

---

[2] "REO" is a term used to describe a class of property owned by a lender—typically a bank, government agency, or government loan insurer—after foreclosure.

61.     On December 31, 2007, despite having an appraisal of the Clarion Inn at the time for only $2.5 million, Herring Bank "sold" the Clarion Inn to MC-CDC-SA for $3,250,000. Herring Bank provided a non-recourse loan of $2,750,000 to finance the purchase. The amount due at closing was $364,192.76. C.C. Burgess personally "loaned" AHF $400,000, which MC-CDC-SA used to make the down payment (the "Down Payment Loan").

62.     AHF did not own any interest in MC-CDC-SA and had no economic reason to incur the $400,000 obligation under the Down Payment Loan.

63.     One year later, on December 31, 2008, MC-CDC-SA gifted the Clarion Inn to AHF "subject to" Herring Bank's $2.750 million mortgage debt.

64.     MC-CDC-SA claimed in its 2007 tax return that the Clarion Inn was worth $5.8 million, and based on the purported "gift" of that property to AHF, took a charitable contribution deduction of $2.5 million. This deduction was passed through and taken by Herring Bank.

65.     In a February 24, 2009 e-mail from Jack Hall of Herring Bank to Steve Sterquell, Mr. Hall asked, "Do we [Herring Bank] have a [sic] interest in MC-CDC San Angelo?" Sterquell responded as follows:

> You did until December 31, 2008. This was the Hotel that Campbell [Burgess] wanted a charitable gift for. We could not do the gift last year because the Bank had held it in REO. At the end of last year we reflected that the LLC purchased it and the Bank held an interest in the LLC for long enough to get the charitable gift.

66.     Herring Bank reacquired title to the Clarion Inn on September 7, 2010, by foreclosing its lien. Herring Bank sold the Clarion Inn on February 17, 2013 for $100,000.

67.     Accordingly, Herring Bank sold a vacant and non-operating REO property off its books in exchange for a $2.750 million non-recourse note receivable from an entity that it in fact owned most of (99.99%). Presumably, Herring Bank could only show that it was financing 85% of the purchase price, so Mr. Burgess personally "loaned" AHF $400,000 to be

used as the down payment. The property was then "gifted" on December 30, 2008 to AHF, valuing the property at $5,800,000 for gift tax purposes (less debt of $3,252,450 principal plus interest, therefore providing Herring Bank with an illegitimate gift tax deduction of $2,547,295). Herring Bank then reacquired the same property through foreclosure and sold it for $100,000.

68.    MC-CDC San Angelo and MC-CDC-SA were sham entities without economic substance.

### C.    LIHTC M2M Affordable Housing Portfolio, Ltd. / Promissory Note Acquisition Company, LLC

69.    On December 28, 2007, AHF and AHF Community Development, LLC owed $4.1 million on five unsecured notes to WGGL, LLC, which mostly matured in 2005.

70.    Sterquell negotiated a $3.1 million discount with WGGL (as a work-out of matured and past-due debt) and formed Promissory Note Acquisition Company, LLC ("Promissory Note Acquisition") to purchase these notes for $1 million. He obtained $500,000 of the $1 million purchase price from AHF Development and $500,000 from a personal loan to Sterquell from Herring Bank. Sterquell then caused Promissory Note Acquisition to pledge the five notes to secure his $500,000 personal loan.

71.    On September 10, 2008, Sterquell arranged for the Burgess Related Parties to acquire 99% of LIHTC M2M Affordable Housing Portfolio, Ltd. ("LIHTC M2M") for (i) allegedly contributing Herring Bank stock to LIHTC M2M (but this transfer of stock never happened), and (ii) loaning LIHTC M2M $1,237,500 (deposited into the AHF Development Account). Sterquell promised he would pay back the loans in four months (with an AHF guaranty) plus provide them with a 3 to 1 tax deduction.

72.    Sterquell then gave LIHTC M2M a 56.9820% limited partnership interest in

Promissory Note Acquisition (allegedly for a contribution of Herring Bank stock valued at $1,325,000, but this stock was never contributed). This purported assignment was backdated from March 2009 to September 2008.

73.     At the end of 2008, Sterquell caused Promissory Note Acquisition to "gift" the uncollectible and worthless notes to AHF. Promissory Note Acquisition claimed a $4,111,275 charitable contribution deduction and the Burgess Related Parties received $2.342 million of that deduction as a pass-through from LIHTC M2M. The only evidence of the purported gift is a backdated gift receipt letter from AHF.

74.     In addition to the Promissory Note Acquisition charitable contribution, the LIHTC M2M 2008 tax return claims another $1,247,495 charitable deduction in 2008 (almost the exact amount of the Burgess Related Parties' loans of $1,237,500) for total charitable deductions of $3,580,479, which were allocated as follows:

| | | |
|---|---|---|
| - | Slemp Trust (35.714%) | 1,302,006 |
| - | Louise Johnson Thomas Trust (35.714%) | 1,302,006 |
| - | Jessie Herring Johnston Trust No. 1 | 65,093 |
| - | Jessie Herring Johnston Trust No. 1 | 130,186 |
| - | Carson Burgess, Inc. | 65,093 |
| - | Banjo, Inc. | 520,781 |
| - | Burgess Trust No. 4 | 65,093 |
| - | Charlotte Burgess-Griffiths | 65,093 |
| - | Carson Burgess | 65,093 |

75.     Both LIHTC M2M and Promissory Note Acquisition were sham entities which lacked any economic substance.

**D.     GOZ No. 3, Ltd. / LIHTC Community Development No. 2, Ltd.**

76.     GOZ No. 3 Ltd. ("GOZ No. 3") was formed on April 17, 2007.

77.    The Burgess Related Parties acquired 99.99% of the limited partnership interests in GOZ No. 3, allegedly in exchange for Herring Bank stock which was never transferred.

78.    The Burgess Related Parties made "loans" aggregating approximately $911,249 to GOZ No. 3, $425,000 of which was purportedly loaned on February 28, 2007, *before* GOZ No. 3 was formed on April 17, 2007.  All of these loans were repaid.

79.    GOZ No. 3 acquired 19% of LIHTC Community Development No. 2 ("LIHTC No. 2") on September 7, 2007, allegedly in exchange for a capital contribution of $95,000 worth of Herring Bank stock—no stock was ever transferred.  Less than four months later, on December 31, 2007, GOZ No. 3 gifted its interest in LIHTC No. 2 to Mid-Continent, another Sterquell-controlled entity, in exchange for a gift tax deduction of $4,518,798.

80.    GOZ No. 3 received a 2007 K-1 from LIHTC No. 2 providing GOZ No. 3 with $4,518,798 of "other deductions" resulting from LIHTC No. 2's alleged gift of four apartment complexes to Mid-Continent on December 31, 2007.  LIHTC No. 2 never owned these four complexes.

81.    The 2007 K-1s from GOZ No. 3 allocated the $4.5 million deductions to the Burgess Related Parties.

82.    On December 31, 2008, the Burgess Related Parties gifted their interests in GOZ No. 3 to AHF in exchange for gift tax deductions aggregating approximately $187,000.

**E.    LIHTC Community Development No. 3, Ltd. / Hurike**

83.    The LIHTC Community Development No. 3, Ltd. ("LIHTC No. 3") was formed on March 7, 2007.  The Burgess Related Parties acquired 99% of LIHTC No. 3 for no consideration; they did, however, loan LIHTC No. 3 $1.188 million and ultimately obtained

flow-through loss deductions that exceeded $4.2 million.

### Campbell Burgess's Testimony

84.     Campbell Burgess is the son of C.C. Burgess and Jane Slemp Burgess.  He started working at the bank in 1992, apparently after he graduated from college.  He started out as the vice president and was involved in all facets of the bank's operations.  He ultimately rose to president of the bank and served as president from 2002 to 2012.

85.     Campbell Burgess is currently the Vice-Chairman of the Board of Herring Bank and the president of Herring Bancorp.  He holds a Vanderbilt University undergraduate degree and an MBA from the University of Chicago-Booth School of Business.

86.     C.C. Burgess is the Chairman of the Board of Herring Bancorp.

87.     The bank's assets grew from 2005 through 2008 from approximately $350 million to $450 million; the number of employees increased from approximately 125 to 225.  During this same timeframe, the bank expanded from three to fifteen branches.  Its net income generally exceeded $5 million per year with a range, on an annual basis, from $2 million to $7 million.

88.     A $2 million loan is a large and important loan for Herring Bank.  For a loan of this size, the bank requires that the borrower submit a business plan and a statement of financial conditions; the bank confirms the complexity of the borrower's management and its ability to execute the business plan.  The bank also requires information regarding the borrower's planned use of the loan proceeds.  In considering approval of a loan of this magnitude, the bank typically looks at possible security for the loan and how the loan will be repaid.  The bank anticipates and considers a possible "exit" plan in the event of the borrower's default.

89.     Campbell Burgess understands the differences between loans and equity investments.  He knows that, with loans, the borrower is obligated to repay the principal and

interest. He understands that, with investments, the investor acquires an ownership interest and thus shares in any increased value of the company, i.e., the investor's return is not limited to a repayment of principal and interest.

90.     The Burgess Related Parties invested in at least eight different AHF-related enterprises. From these eight investments, the Burgess Related Parties received, collectively and in the aggregate, over $19.3 million in tax deductions.

91.     On the Barrington-Bell deal, Campbell Burgess testified that it is and was intended to be an equity investment. When asked if it was common to have a guaranty from a third party of the amount of the equity investment, Burgess testified that he did not know. He made the same response to the question of whether it was common to receive a firm promise of a 12% return on a pure equity investment.

92.     In his attempt to explain the various deals, Campbell Burgess would often resort to jargon as a way to deflect the point of the question asked of him. He testified that in the "typical scenario," the "financial stack" would include the possibility of tax deductions, a bond issue, and tax credits; and that, for example, a $1 million investment might result in a $2 million tax deduction from the built-up value of the project.

93.     Through the various deals, from 2005 to 2008, Herring Bank loaned or invested over $10.9 million. Burgess testified that the bank's relationship with Sterquell and AHF was "very important."

### Jack Hall

94.     Jack Hall is the Chief Financial Officer of Herring Bank. He is also a Certified Public Accountant. Mr. Hall testified that he had been "in banking" his entire forty-plus year career. He has been with Herring Bank since 2002. As CFO he is in charge of the financial

accounting of the bank and all financial and regulatory reporting required of the bank. He testified that he maintains all financial records of the bank and oversees the bank's tax filings as well.

95.     Hall is familiar with the bank's ownership structure and how the Burgess family and its various affiliated entities (including family trusts) are involved and interrelated. He confirmed that the Burgess family, in effect, owns approximately 80% of the bank; that Herring Bank is directly owned by a holding company, Herring Bancorp; and that Herring Financial Services is a subsidiary of Herring Bank.

96.     Hall confirmed that Herring Bank, in at least his history with the bank, had entered into two equity investments, the Barrington Bell deal and the LIHTC Amarillo Gardens deal. He described both deals as "hybrid" investments. "They have characteristics of the equity investment with a characteristic of a loan as far as the repayment of the principal and interest." Transcript of Trial on March 24, 2014, at 116–17 [Docket No. 141]. He acknowledged that they had characteristics of a loan because the "money is due back by a date certain with interest[.]" *Id*. He said that they have the characteristics of equity because "we have a continuing investment in that company beyond the repayment of the principal and interest." *Id.*

### Alan Weiner

97.     Alan Weiner, an expert called by the Trustee, testified and provided his opinion of AHF's solvency during the time frames relevant to the issues here. Mr. Weiner is certainly qualified to render such an opinion. Weiner holds a Bachelor of Science in Computer and Informational Science degree from the University of Florida; he holds an MBA from the Wharton School at the University of Pennsylvania. Weiner is the managing director of Focus Management Group, a company that provides consulting and management services to companies

in financial distress.  Focus was employed by AHF during its chapter 11 bankruptcy case, with Weiner serving as the primary person responsible for Focus's services.  Weiner was instrumental in AHF obtaining confirmation of its chapter 11 plan and, more important, was responsible for the management and ultimate planned disposition of the dozens of properties that were under AHF's umbrella.  Weiner no doubt has more and greater knowledge of AHF's operations, both prior to and during the bankruptcy proceedings, than any other person.  He has prior experience as an investment banker, particularly involving real estate companies; he has, in addition, worked on deals involving low-income housing projects.  Weiner has testified several times before this Court.

98.     In assessing AHF's solvency over the years preceding its bankruptcy, Weiner employed a methodology that considered an overall assessment of AHF's complicated balance sheet.  AHF was an asserted non-profit entity that sat at the top of a large and complicated affordable housing enterprise.  It included approximately 65 separate entities—limited liability companies and limited partnerships—each of which owned its own property, mostly apartment complexes.  There were over 14,000 units within these projects.  AHF generally served, either directly or indirectly, as the controlling member (as to the LLCs) or general partner (of the limited partnerships).  The entire enterprise flowed up to and was controlled by Steve Sterquell who was the principal and person in sole control of AHF.

99.     Weiner assessed the potential values of the particular ventures, as reflected by the hard assets—the real estate properties—and the liabilities of such individual entities.  The net equity values flowed up and were attributable to AHF.  The properties—and thus the single asset LLCs or limited partnerships—were categorized by how they were financed.  Thirteen properties were conventionally financed, i.e., notes and mortgages; seventeen properties were financed by

pooled investor groups lured in with allocated tax credits; thirty-five projects were financed through the issuance of tax exempt bonds. Weiner employed an income capitalization method with a cap rate as a way to derive a present valuation for each of the properties. This approach is justified by considering what an arms-length investor would pay for the stream of income generated by the properties. Weiner used a cap rate of 8% to 10% in his analysis. In assessing the liabilities of the seventeen tax credit properties, Weiner took into account the guaranties issued by AHF to investors. The issued guaranties, according to Weiner, might include an operating deficit guarantee, a tax credit delivery guarantee, a tax credit recapture guarantee, a repurchase guarantee, and a guarantee of maintenance of a real estate tax exemption. Such guaranties, per Weiner, are common with deals structured with the use of tax credits. They are also different from the types of guaranties issued in the transactions at issue here. The guaranties here, for example, are unconditional promises to repay the amount of invested dollars by Herring Bank; though labelled a guaranty, they are substantively the same as promissory notes.

100.     In formulating his opinion, Weiner used the definition and concept of "insolvency" as set forth in the Bankruptcy Code. The Code adopts a traditional balance sheet test that looks at the sum of the debtor's debts relative to the value of all of the debtor's property, at a fair valuation. *See* 11 U.S.C. § 101(32)(A).

101.     Weiner concluded that property subject of the tax exempt and bond financings had no value flowing up to AHF for the period from December 31, 2004 through 2008.

102.     Weiner concluded, further, that AHF, as a result of the guaranties it issued, had substantial liabilities to investors in the tax credit partnerships, all of which were formed from 1997 through 2004.

103.     Weiner concluded that AHF had some attributable value from receivables owed it

by the tax credit entities. But it also had several notes payable to various financial institutions.

104.     Weiner concluded from his detailed analysis that AHF was insolvent during the period from December 31, 2004 through December 31, 2008.

105.     The Court finds that Weiner was qualified, both by education and experience, to render his opinion and that the methodology he used was fair, reliable, and reasonable. In addition, Weiner was intimately familiar with the properties, the complicated financing mechanisms, and the history of AHF and its enterprise. Herring Bank objected to Weiner's failure to use or obtain full-blown real estate appraisals in arriving at net equity values for the 60 plus apartment complexes. This is simply unrealistic for an assessment of *AHF's value* for purposes of a solvency analysis. Finally, the Court can safely conclude that Steve Sterquell would have clearly known of the condition, both physically and financially, of the many properties. Weiner's first-hand testimony along these same lines does not discredit his opinion and does not admit of a hind-sight bias. It simply reflects what Sterquell knew at the time.

**AHF Development**

106.     Funds that were ostensibly invested in AHF or its affiliated entities and funds paid out to investors, including the transfers made to Herring Bank here, flowed through an account owned by AHF Development, Ltd. ("AHF-D"). Weiner analyzed the bank records for this account, and he also reviewed the assets and operations of AHF-D. Weiner confirmed that AHF-D had no employees, no business operations, no office, and no office furniture or equipment. AHF-D had only the bank account. Sterquell used this account to make payments to investors, to make payroll of AHF, and to pay other bills of AHF. All signatories on this account were employees of AHF.

107.     Weiner concluded that Sterquell and AHF employees had complete dominion and

control over the AHF-D account and that the funds passing through this account were the property of AHF.  The use of AHF-D furthered the AHF enterprise.  Weiner further opined that Sterquell and AHF used the AHF-D account as a means to avoid scrutiny of certain transactions that were effected by use of the account.  The account was therefore beyond the scrutiny of regular auditors of AHF.  As a result, AHF-D was not part of the consolidated audit of AHF.  Weiner testified that the account was used to keep properties afloat, properties that were part of AHF's affordable housing enterprise.  AHF, through Sterquell, directed the use of the funds from the AHF-D account.

108.    Herring Bank and Campbell Burgess have previously taken the position in the AHF bankruptcy case that "both AHF and AHF Development were controlled and used primarily for the benefit of Steve Sterquell. . . . Sterquell managed both entities."  Trustee's Exhibit 902.  They further stated that "[t]here was commingling of funds to such an extent to conclude that AHF Development operated merely as another bank account for the benefit of AHF."  *Id*.

109.    On August 17, 2011, this Court found that "[AHF] Development conducted no business operations and provided no goods or services . . . [,] $140 million [including Herring Bank's millions] passed through Development . . . [and] Development was nothing more than a conduit bank account."  Herring Bank did not appeal the Court's decision.  In both *Rice Trust* and *Templeton*, the Court iterated that the funds of AHF-D were in fact the funds of AHF, and the finding is the same here.  *Templeton*, 2013 WL 1316723, at *19; *O'Cheskey v. Rice Trust (In re Am. Hous. Found.)*, No. 11-02006, 2012 WL 5430988, at *7 (Bankr. N.D. Tex. Nov. 7, 2012).

**Sterquell's Suicide**

110.    Well before AHF's involuntary filing, Sterquell's (and AHF's) enterprise was in deep trouble.  The affordable housing model had failed, and AHF and its many affiliates could not begin to handle the obligations they had and promises made.  It was also involved in many questionable deals.  Sterquell no doubt succumbed to the pressures and problems confronting him.  On April 1, 2009, he was killed in a one-car wreck that was ruled to be a suicide.  By all accounts, Sterquell was brilliant, charismatic, and convincing.

## II.    CONCLUSIONS OF LAW

**Jurisdiction and Venue**

1.    The Court has jurisdiction over the complaint and the causes of action asserted herein under 28 U.S.C. §§ 157(a) and (b) and 1334.

2.    The causes of action asserted herein are core proceedings under 28 U.S.C. §§ 157(b).

3.    Venue of this action is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

4.    This Court has the power and is authorized to provide the requested relief pursuant to §§ 105, 502(d), 510(b), 510(c), 544, 547(b), 548, and 550 of the Bankruptcy Code. In the event a superior court determines that some or all of the causes of action here are not core proceedings or not properly subject of this Court's authority, these findings and conclusions are submitted as proposed findings and conclusions.  *See Stern v. Marshall*, 131 S. Ct. 2594 (2011) (addressing constitutional authority of bankruptcy court); *Executive Benefits Ins. Agency v. Arkison*, 134 S. Ct. 2165 (2014) (holding that bankruptcy court may issue proposed findings and conclusions in a core proceeding over which the bankruptcy court does not have constitutional authority); *In re BP RE, L.P.*, 735 F.3d 279 (5th Cir. 2013) (holding parties cannot consent to

final adjudication by bankruptcy court in a non-core, related-to proceeding); and *Galaz v. Galaz (In re Galaz)*, No. 13-50781, 2014 WL 4197213 (5th Cir. Aug. 25, 2014) (holding district court may treat bankruptcy court's findings and conclusions as proposed).

### Trustee's Causes: Objection to Claim / Avoidance of Transfers

5.      As stated above (Finding 14), the Trustee objects to Herring Bank's proof of claim to the extent it is based on the Barrington-Bell Claim and the River Falls Claim.  The Trustee submits that Herring Bank's claim under these two deals must be barred under the following theories: first, that these two deals were fraudulent and part of an illegitimate scheme and thus must be set aside under the *in pari delicto* doctrine; second, that the Barrington-Bell Claim is predicated upon an invalid guaranty and thus must fail under contract law; third, that both the Barrington-Bell Claim and the River Falls Claim, specifically the guaranties issued by AHF in connection with each deal, are avoidable as fraudulent obligations under 11 U.S.C. § 544(b) and the Texas Uniform Fraudulent Transfer Act (TUFTA), Texas Business Commerce Code § 24.005; and fourth, that the two claims must be subordinated under both mandatory subordination (§ 510(b)) and equitable subordination (§ 510(c)).  Finally, the Trustee contends that Herring Bank cannot successfully assert a good-faith defense to any of the Trustee's objections.

6.      In addition to the claim objections, the Trustee submits that the $2,971,880 in payments made to Herring Bank are fraudulent transfers under 11 U.S.C. § 548(a)(1)(A) (actual fraud) and (a)(1)(B) (constructive fraud), and $18,084 in payments constitute preferential transfers made within ninety days of AHF's bankruptcy filing (§ 547).

7.      Both the Barrington-Bell Claim and the River Falls Claim of Herring Bank are, as set forth in Herring Bank's proof of claim, based on guaranties issued by AHF and thus signed

by Steve Sterquell.  As to the Barrington-Bell Claim, the guaranty from AHF provides that it is an unconditional guarantee of payment and performance of the partnership obligations under the Barrington-Bell partnership agreement.  The guaranty issued in connection with the River Falls deal was issued to induce Herring Bank to make the loan and provides that it "absolutely and unconditionally guarantees" payment of the debt owed by River Falls to Herring Bank.

8.      Herring Bank's proof recites, in addition, that its claims under these two deals are unliquidated, unsecured claims arising from fraud, breach of fiduciary duties, violations of the Texas Theft Liability Act, and violations of the Texas Securities Act.

### Herring Bank's Defenses and Counterclaims

9.      Herring Bank denies that the Trustee is entitled to disallow its claims or that the Trustee is entitled to recover on any of its affirmative claims: in substance, Herring Bank denies that the Trustee is entitled to any relief or recovery.  Herring Bank also asserts affirmative defenses of money had and received, constructive trust, *in pari delicto*, and setoff.  Herring Bank also pleaded that, in connection with the two transactions, it holds the defenses of good faith, the ordinary business defense (as to alleged preference payments), recoupment, estoppel, and mutual mistake (as to the definition of "Initial Capital Contribution" under the partnership agreement).  Finally, Herring Bank has filed its counterclaim seeking a declaratory judgment as to both the Barrington-Bell and the River Falls deals asking that the Court find that it, Herring Bank, did not engage in inequitable conduct that would justify equitable subordination of its claim.

### Characterization of Claims

10.      An analysis of the Barrington-Bell Claim, and in particular the Barrington-Bell transaction, begins with its structure.  Herring Bank made a capital contribution of $1,505,000 for which it received a 25% interest in the newly formed limited partnership, LIHTC Barrington-

Bell Plaza, Ltd. Multi-Family Rehab Partners served as the general partner holding a 75%

interest in the partnership. As set forth above (Findings 16, 23), Herring Bank's capital

contribution was made on March 31, 2005, a week after the limited partnership certificate was

filed with the Texas Secretary of State. Herring Bank's capital contribution and partnership

interest were maintained through 2006, 2007, and 2008.

11. The guaranty issued by AHF in connection with the Barrington-Bell deal provides

that AHF was unconditionally obligated to repay the investment within 24 months, plus a

preferential return of 12% per annum. The guaranty, therefore, goes beyond a promise to

purchase *the partnership interest* from Herring Bank. As a result, in return for its capital

investment, Herring Bank was entitled to the following benefits:

- an unconditional promise of repayment of the $1,505,000;

- an unconditional promise of payment of a return of 12% per annum on the investment;

- the usual benefits—the upside of a profitable enterprise, as well as potential pass-through tax benefits—but not the risk associated with an investment: in fact, as structured, there was no risk as to liability for the $1,505,000.

12. The River Falls deal is, *in substance*, similar to the Barrington-Bell transaction.

The one significant difference, however, is that Herring Bank's $2 million transfer, the triggering

event of the deal, was documented as a loan rather than a capital contribution. The partnership

formed at the inception of the transaction, LIHTC River Falls, issued a promissory note made

payable to Herring Bank. Like the Barrington-Bell deal, the "loan" amount accrued interest, but,

unlike Barrington-Bell, it had an actual maturity date. The note matured on September 25, 2008.

Multi-Family Rehab Partners was the designated general partner; Vaudrey Capital, LP, a Burgess

entity, served as limited partner. Though documented as a secured loan with a set interest rate

and a fixed maturity, the partnership carried the $2 million loan as a capital contribution. It

issued a K-1 to Herring Bank for the 2007 tax year reflecting a $2 million capital contribution and designated Herring Bank as holding a 20% share of profits, losses, and capital in the partnership.  *See* Trustee's Exhibit 629.

13.     Herring Bank's claim here is based on AHF's guaranty of its $2 million loan. AHF's interest in the partnership, according to the transaction documents, was indirect as it was a general partner of Multi-Family Rehab Partners.

14.     At least as documented and structured, the River Falls deal, at least arguably, makes legal sense.  It was a secured loan that was guaranteed by the general partner of the partnership's general partner.

15.     Apart from the $2 million advanced by Herring Bank, there was no economic substance to the contemplated project that was supposedly being partially funded by Herring Bank's advance.

16.     To address Herring Bank's claims—both the Barrington-Bell Claim and the River Falls Claim—and the Trustee's causes of action, the Court must first determine the real nature of the two transactions.  For this, the Court looks to both the form and the substance of the deals and construes each deal as an integrated whole.  The Court may "delve behind the form of transactions and relationships to determine the substance."  *In re United Energy Corp.*, 944 F.2d 589, 596 (9th Cir. 1991) (citations omitted).  The partnership agreements, subscription agreements, guaranties, and other instruments evidencing each of the deals were, within each deal, intimately intertwined.  Analyzing one instrument is pointless without consideration of the others.  *See id.*  And, most important, the benefits received and the expectations of Herring Bank from each deal flowed from a single investment or loan, i.e., the loaned or invested dollars were not allocated as among the various benefits and promises flowing back to Herring Bank.

17.     Herring Bank made a $1.505 million capital contribution to the Barrington-Bell partnership; in return, it received *both* an interest in the partnership *and* a promise of repayment of the invested amount.  This sum accrued interest at 12%.  The guaranty from AHF refers back to the partnership obligation.  As structured, Herring Bank's "investment" bore no risk as to liability.

18.     From Herring Bank's side of the transaction, the River Falls deal was different *in form* from the Barrington-Bell deal.  Herring Bank made a loan of $2 million to the partnership, which loan was guaranteed by AHF.  The loan was, however, carried as a capital contribution by the partnership.  The differing treatments cannot be reconciled.

19.     Both deals, Barrington-Bell and River Falls, were ultimately bogus deals.  There were no properties in which the funds were invested, and the partnerships, apart from Herring Bank's contributions, had no other assets.

20.     Herring Bank seeks, in particular, recovery from AHF, and thus the Court must characterize the Barrington-Bell and River Falls deals.  The Bankruptcy Code addresses real claims—secured, priority, administrative, unsecured—and equity interests.  "It does not have a category for strange, hybrid-type arrangements as exist here."  *Rice Trust (In re Am. Hous. Found.)*, No. 11-02006, 2012 WL 4622310, at *11 (Bankr. N.D. Tex. Sept. 30, 2012).  The Court considers Herring Bank's claims against AHF.  The guaranties issued by AHF are the instruments that create the primary basis for Herring Bank's claims.  But the guaranties cannot be considered apart from the other transactions that arose in connection with Herring Bank's contributions.  The circumstances here make recharacterization a threshold consideration.

21.     The Fifth Circuit in *In re Lothian Oil Inc.*, 650 F.3d 539 (5th Cir. 2011), held that bankruptcy courts have the ability to recharacterize debt as equity.  *Id.*

When a creditor files a timely claim, the Code states that "the court, after notice and a hearing, shall determine the amount of such claim ... and shall allow such claim in such amount, except to the extent that—(1) such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law...." 11 U.S.C. § 502(b). The Supreme Court has held that the "applicable law" is state law: "Congress has generally left the determination of property rights in the assets of a bankrupt's estate to state law." *Butner v. United States*, 440 U.S. 48, 54, 99 S. Ct. 914, 918, 59 L.Ed.2d 136 (1979). As a result, "there is no reason why such [state law] interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding." 440 U.S. at 55, 99 S. Ct. at 918. Our analysis of "applicable law" under § 502(b) is therefore an application of state law, unless Congress has stated otherwise.

Taken together, *Butner* and § 502(b) support the bankruptcy courts' authority to recharacterize claims. If a claim asserts a debt that is contrary to state law, the bankruptcy court may not allow the claim. Moreover, where the reason for such disallowance is that state law classifies the interest as equity rather than debt, then implementing state law as envisioned in *Butner* requires different treatment than simply disallowing the claim. The Fourth Circuit identified the inadequacy of traditional disallowance in noting that "[w]hen a bankruptcy court disallows a claim, the claim is completely discharged. By contrast, recharacterization is appropriate when the claimant has some rights via-a-vis the bankrupt." *In re Dornier Aviation, Inc.*, 453 F.3d 225, 232 (4th Cir.2006) (internal citation omitted; emphasis in original). These rights, fixed by state law, are not irrelevant to the court's decision to disallow a claim. To the contrary, recharacterizing the claim as an equity interest is the logical outcome of the reason for disallowing it as debt.

*Lothian Oil*, 650 F.3d at 543.

22. The Court looks to Texas state law to determine whether each of the Barrington-Bell and River Falls deals was an investment that created, at most, an equity claim or was a loan subject now to treatment as an unsecured claim. *See* 11 U.S.C. § 502(b); *see also Lothian Oil*, 650 F.3d 539. In this regard, Texas courts have looked to the multi-factored tests from federal tax law cases. *Lothian Oil*, 650 F.3d at 544. These include a 16-factor test as set forth in *Fin Hay Realty Co. v. United States*, 398 F.2d 694, 696 (3d Cir. 1968); a 13-factor test from *Estate of Mixon v. United States*, 464 F.2d 394, 402 (5th Cir. 1972); and an 11-factor test from *Jones v. United States*, 659 F.2d 618, 622 n.12 (5th Cir. 1981).

23. As with other factor-driven tests, the Court reviews the evidence in light of all

factors, "while realizing that the various factors are not of equal significance and that no one factor is controlling." *Lothian Oil*, 650 F.3d at 544 (quoting *Mixon*, 464 F.2d at 402). Additionally, the various factors "are only aids in answering the ultimate question whether the investment, analyzed in terms of its economic reality, constitutes risk capital entirely subject to the fortunes of the corporate venture or represents a strict debtor-creditor relationship." *Fin Hay Realty*, 398 F.2d at 697.

24.    Factors considered are the following:

> (1) the intent of the parties; (2) the identity between creditors and shareholders; (3) the extent of participation in management by the holder of the instrument; (4) the ability of the corporation to obtain funds from outside sources; (5) the 'thinness' of the capital structure in relation to debt; (6) the risk involved; (7) the formal indicia of the arrangement; (8) the relative position of the obligees as to other creditors regarding the payment of interest and principal; (9) the voting power of the holder of the instrument; (10) the provision of a fixed rate of interest; (11) a contingency on the obligation to repay; (12) the source of the interest payments; (13) the presence or absence of a fixed maturity date; (14) a provision for redemption by the corporation; (15) a provision for redemption at the option of the holder; and (16) the timing of the advance with reference to the organization of the corporation.

*Id.* at 696. Yet additional factors are the name or title of the instrument, if any, memorializing the deal, *Mixon*, 464 F.2d at 402, and the right to enforce payment of principal and interest, *Jones*, 659 F.2d at 622 n.12.

25.    On a more basic level, the Court notes that creditors and investors are distinguishable in the way they each view the solvency or insolvency of the enterprise with which they are dealing. *In re Deep Marine Holdings, Inc.*, No. 10-03116, 2011 WL 160595, at *5 (Bankr. S.D. Tex. Jan. 19, 2011). For example, if the enterprise prospers, a creditor expects nothing more than repayment of its fixed debt. *Id.* In fact, the creditors rely on the *equity* provided by the company's investors. *Id.* at *6. Investors, however, look to share in the profits to the exclusion of creditors. *Id.* at *5. The flip side of this expectation is the enhanced risk of

insolvency borne by investors. *Id.* The subordination provisions of the Bankruptcy Code, both § 510(b) (mandatory subordination of damage claims arising from purchase of a security) and the absolute priority rule set forth at § 1129(b) of the Bankruptcy Code (providing that "unsecured creditors stand ahead of investors in the receiving line and their claims must be satisfied before any investment loss is compensated," *In re SeaQuest Diving, LP*, 579 F.3d 411, 420 n.5 (5th Cir. 2009)), are said to arise from these basic expectations and, thus, the very nature of investments compared to loans. Accordingly, the risk of the illegality in issuance of equity is properly borne solely by investors because "it would be improper to reallocate this risk to creditors who (1) never bargained for an equity position in the debtor and (2) extended credit to the debtor in reliance on the equity cushion provided by the investors." *Deep Marine*, 2011 WL 160595 at *6 (quoting *SeaQuest*, 579 F.3d at 420).

26.     The structure of the Barrington-Bell deal is suspect. Campbell Burgess testified that the $1.505 million investment was a capital contribution. But he also testified that AHF was obligated to repay the bank's investment. The filing of its proof of claim for such amount underscores this point. AHF's obligation under the guaranty was thereby divorced from the success or failure of the partnership.

27.     The intent of the parties is muddled. They intended for the investment to be both a risk-laden capital contribution and a risk-free, at least as to liability, promise of repayment.

28.     The identity and relationship between contracting parties is an important factor. If the parties do not negotiate at arms length, a court should be wary of them trying to "mold" a transaction into a financially amorphous product that can conveniently be either a loan or an investment. *See Fin Hay*, 398 F.2d at 697. Here, there was no actual negotiation. Sterquell and Campbell Burgess, for the bank, certainly had a close relationship. As set forth, they had been

involved together in numerous other questionable deals. Sterquell was described as brilliant and charismatic. Burgess, however, is a highly educated, sophisticated, and successful banker and businessman. He knew the import of entrusting funds with Sterquell and fully understood the basic legal nature of the instruments and entities that were created as part of the deals. Given this, Herring Bank was clearly complicit with Sterquell at the threshold of each of these deals. Sterquell knew these deals were not grounded in economic reality. As stated, Sterquell had to know they were risky; if Burgess did not also so realize, he certainly should have known.

29.     Another factor concerns the amount of capital the recipient had at the time of the transaction. If the recipient was capitally thin, then the transaction weighs towards an equity investment. *See Jones*, 659 F.2d at 622; *In re AutoStyle Plastics, Inc.*, 269 F.3d 726, 751 (6th Cir. 2001). With each of the deals here, Herring Bank was contributing capital for a newly created limited partnership. AHF was an asserted non-profit entity that sat at the top of the enterprise that included dozens of for-profit companies or partnerships. Many of the deals orchestrated by Sterquell were complex and legally questionable. The Court can safely assume that AHF was capitally thin. It is also important to note that Herring Bank's funds were controlled by Sterquell (and, by association, arguably AHF) and used for whatever purpose Sterquell saw fit.

30.     The "risk involved" in the transaction typically considers the presence or lack of security. Absence of security is a "strong indication that the advances were capital contributions rather than loans." *See id*. at 752. Apart from the AHF guaranty in the Barrington-Bell transaction, there was no collateral or other security behind the deal. As for the River Falls transaction, the parties did enter into a security agreement under which the partnership pledged and assigned 75 units of partnership interest in the partnership to Herring Bank as security for its

loan. *See* Trustee's Exhibit 622.

31.     A credit analysis was performed by the bank on each of the Barrington-Bell and River Falls deals. In Barrington-Bell, the credit analysis does not, however, inform the nature or the structure of the transaction. The formal credit analysis looks at AHF as a 501(c)(3) non-profit organization, its "mission" and operations, and its history with the bank. It included an analysis of the apartment complexes, the Barrington and the Bell Plaza, that were supposedly subject of the project, their operations with projections both historical and going forward. It also included a balance sheet of AHF and its affiliates, along with a cash flow analysis. The credit analysis does *not* describe how the partnership was to acquire the subject properties or, really, how Herring Bank's invested dollars were to be spent. The very questions begged by the structure were left unanswered. The credit analysis states that the repayment of the investment would be primarily "from the sale of tax credits" and, secondarily, by calling "on guarantors." *See* Defendant's Exhibit 300.

32.     The credit analysis on the River Falls deal is similar in format. This transaction took place two years after Barrington-Bell and thus refers to Barrington-Bell; the credit analysis is, by comparison, more informative. It describes the specific request as follows: "American Housing Foundation is selling the Riverfalls Apartments and Three Fountains Apartments to a new partnership to allow for rehabilitation of the apartments." It states that the requested $2 million loan was to provide "temporary funding of pre-acquisition and pre-development expenses associated with the renovation and refinance of the" apartments. *See* Defendant's Exhibit 500.

33.     The formal indicia is relevant to the inquiry. As set forth above, the Barrington-Bell deal was structured as a formal investment; the River Falls deal was structured as a true

loan.

34.     In assessing Herring Bank's position relative to other creditors regarding the payment of principal and interest, the documents on both deals here—Barrington-Bell and River Falls—contemplated the return or repayment of the investment with a return (in Barrington-Bell) or principal with interest (in River Falls). But in Barrington-Bell, Herring Bank never took formal action to recover the $1.505 million or the preferential return. Such sums were ostensibly due within 24 months of March 31, 2005. And Jack Hall, the CFO of Herring Bank, explained that the bank had a continuing investment in Barrington-Bell beyond the repayment of principal and interest. Campbell Burgess testified that had the Barrington-Bell deal been structured as a loan rather than an equity investment, the bank would have taken formal action to address Barrington-Bell's (and AHF's) obligation to return the $1.505 million.

35.     Though Herring Bank, on the Barrington-Bell deal, obtained, at least ostensibly, certain rights as a limited partner of the partnership, there is no evidence that it exercised the rights of an active limited partner.

36.     Both the Barrington-Bell deal and the River Falls deal provided for a return on the amount invested (as in Barrington-Bell) or loaned (as in River Falls).

37.     The evidence does not describe any redemptive rights of Herring Bank in the Barrington-Bell partnership.

38.     The timing of both transactions—the capital contribution in Barrington-Bell and the loan in River Falls—corresponded with the formation of the partnerships and the guaranties issued from AHF.

39.     In assessing the above factors, and upon consideration of the very nature of investments compared to true loans, the Court concludes that the Barrington-Bell deal must be

characterized as an equity investment, just as it was designated. This characterization encompasses the so-called guaranty issued by AHF. Herring Bank and AHF were complicit in the structure of the Barrington-Bell deal. Both AHF (through Steve Sterquell) and Herring Bank (through Campbell Burgess and other officers) were sophisticated parties that fully understood the distinction between loans and capital investments. The risk associated with an investment lies with the investor. This characterization recognizes that Herring Bank put up real dollars and thus had some rights vis-à-vis the bankrupt. *See Lothian Oil*, 650 F.3d at 543. "[I]t is the typical outcome of the reason for disallowing it as debt." *Id.*; *see also AutoStyle Plastics*, 269 F.3d at 748–49.

40.     The Barrington-Bell claim—on its face—arises from Herring Bank's purchase of an equity interest in Barrington-Bell and is therefore subject to mandatory subordination under § 510(b) as the claim arises from the purchase or sale of an equity security of AHF.

41.     The River Falls deal was structured as a loan and the Court concludes that, upon consideration of the above factors, it should be treated as a loan, with a guaranty of the loan issued from AHF.

### Herring Bank's Good Faith

42.     On the question of whether Herring Bank acted in good faith and thus whether it can assert a good faith defense, the Trustee submits that the knowledge and conduct of Campbell Burgess (and C.C. Burgess) in connection with the various deals between them and Sterquell must, in effect, be imputed to Herring Bank. The deals here, according to the Trustee, are part of an overall fraudulent enterprise, and thus all obligations upon which Herring Bank asserts its claim and all transfers from AHF to Herring Bank are sufficiently tainted so as to defeat any good faith claim. Herring Bank submits that the other deals are not relevant to its claims here.

43.     The Court considers the merits of the transactions at issue here—the Barrington Bell deal and the River Falls deal.  The structure and the facts and circumstances, both on the surface and substantively, of each deal leads the Court to its result.  In doing so, it has, for example, concluded that Barrington Bell must be characterized as a capital contribution and Rivers Falls as a loan.  Every deal between Sterquell and the Burgesses, as with all of Sterquell's deals, are highly complicated (perhaps more so by their incoherence than anything else).  And they were all orchestrated by Sterquell.  The Burgesses are sufficiently sophisticated, particularly Campbell Burgess, to appreciate that the very structure of each deal was suspicious.  The tax angles and benefits arising from the various other transactions are particularly egregious.  The transactions were simply too good to be true, and they, the Burgesses, are charged with knowledge of such.

44.     This places Herring Bank in a sort of legal purgatory.  It is charged with the knowledge that several transactions were, to say the least, highly questionable.  But neither the Barrington Bell deal nor the River Falls deal involved the outrageous tax benefits seen in the other transactions (and in other cases before this Court).

45.     Apart from Campbell Burgess's and C.C. Burgess's involvement, the Court finds no direct link or correlation between the two deals here and the other described transactions involving the Burgess family and Sterquell.  The deals here did, in addition, involve the due diligence and typical protocol used by the bank on other major loan transactions.

46.     In a case arising out of the AHF bankruptcy proceeding, the Fifth Circuit has reiterated the inquiry to be made by the Court in assessing the good faith defense.  The Court looks to "whether the claimant was on notice of the debtor's insolvency or the fraudulent nature of the transaction:

The good faith test under Section 548(c) is generally presented as a two-step inquiry. The first question typically posed is whether the transferee had information that put it on inquiry notice that the transferor was insolvent or that the transfer might be made with a fraudulent purpose. While the cases frequently cite either fraud or insolvency, these two elements are consistently identified as the triggers for inquiry notice. The fraud or insolvency predicate is set forth in countless cases . . . .

. . . The weight of the authority . . . indicates that a court should focus on the circumstances specific to the transfer at issue—that is, whether a transferee reasonably should have known . . . of the fraudulent intent underlying the transfer.

Once a transferee has been put on inquiry notice of either the transferor's possible insolvency or of the possibly fraudulent purpose of the transfer, the transferee must satisfy a "diligent investigation" requirement.

*Horton v. O'Cheskey (In re Am. Hous. Found.)*, 544 F. App'x 516, 520 (5th Circuit 2013) (quoting *Christian Bros. High Sch. Endowment v. Bayou No Leverage Fund, LLC (In re Bayou Grp., LLC)*, 439 B.R. 284, 310–12 (S.D.N.Y. 2010)).  In *Horton*, the defendant, Horton, was sued by the Trustee under § 548(a)(1)(B) of the Bankruptcy Code, and Horton's good faith defense under § 548(c) was considered by the bankruptcy court and by the Fifth Circuit on appeal.

47.     As the Fifth Circuit noted in the *Horton* case, this Court's judgment regarding Horton's failure of good faith was based on its conclusion that the arrangement there was an illegal tax shelter and Horton had reason to know of the fraudulent nature of the deal.  As pointed out, and as argued by Herring Bank, neither the Barrington-Bell deal nor the River Falls deal involved the bank's receipt of an illegitimate tax benefit.  Improper deductions were at the root of the other described deals between AHF (and Sterquell) and the Burgess Related Parties.  But, to their credit, the Burgess Related Parties have withdrawn their claims here and have settled with the Trustee.

48.     Assessing the *bank's* bona fides is difficult.  But, to the specific inquiry, the Court

concludes that the evidence, considered as a whole, does not establish that Herring Bank knew or should have known that AHF was insolvent at the time of the transaction.  In construing the good faith test, the Court considers the fraudulent purpose component—whether Herring Bank had sufficient information to put it on notice of AHF's (and, really, Steve Sterquell's) fraud—as looking back to the actual fraud cause under § 548(a)(1)(A) for avoidance of a transfer.  (By the same token, the Court considers the insolvency component as referring back to the constructive fraud cause under § 548(a)(1)(B).)  While the other deals place the Burgesses in a bad light, the test instructs the Court to "focus on the circumstances specific to the transfer at issue . . . ." *Id.* The structure and substance of the two deals here, the Barrington-Bell and River Falls, were nonsensical in some respects.  An equity interest cannot also be a loan, and a loan cannot also be carried as a capital contribution.  Campbell Burgess knows and understands these basic principles.  But the question is whether he was on notice that AHF was engaged in a fraudulent activity, an activity that the Court construes as impacting the actual fraud element of § 548(a)(1). And critical to this cause is the debtor's—AHF's—intent to defraud other creditors of AHF.

49.     The structure of the deals here and Campbell Burgess's knowledge gained from them, and, to a lesser extent, from his other dealings with Sterquell, raise many questions.  Every transaction was exceedingly complex.  Herring Bank and Burgess trusted Sterquell.  The complexity of the transactions and Sterquell's ability to sell his pitch arguably prevented any consulted professional, within the context of an inquiry, from unraveling Sterquell's overall scheme.  Campbell Burgess knew much and is a highly educated and sophisticated banker and businessman.  He understands financial and commercial transactions and their basic legal effects. But the Barrington-Bell and River Falls deals are different from the other transactions.  As the inquiry focuses on the transactions at hand, the Court concludes that Herring Bank was not on

notice of the implication of a fraudulent enterprise being conducted by AHF on other creditors of AHF. Because of this, the Court further concludes that Herring Bank's good faith defense is satisfied.

### Value from Herring Bank to AHF

50.     In determining the nature of the transactions—both Barrington-Bell and River Falls—the Court has construed each one as an integrated whole. This has resulted in the Court's characterization of the Barrington-Bell deal, including the guaranty, as an equity investment and River Falls as a true loan. The same approach is used in assessing whether, in River Falls, Herring Bank provided reasonably equivalent value *to AHF* in return for AHF's guaranty. Herring Bank loaned $2 million to, ostensibly, the partnership. But AHF asserted control over the funds and directed the use of the funds. And this was done for the benefit of the AHF enterprise. Given the approach taken by the Court in determining the nature of the transactions, it is only fair to take the same approach in determining whether AHF received value in return for issuance of its guaranty. *See* 5 Collier on Bankruptcy ¶ 548.03[6] (Alan N. Resnick & Henry J. Sommer, eds., 16th ed. 2014).[3] This is consistent, moreover, with the Court's conclusion that the payments *to* Herring Bank from the AHF-D account were from AHF as the entity asserting dominion and control over such funds. Accordingly, the Court concludes that the value given, the $2 million loan made by Herring Bank, resulted in sufficient value to AHF for the guaranty obligation of AHF.

### Effect of Payments

51.     The $771,867 in payments to Herring Bank by AHF on the Sterquell notes (*see*

---

[3] It states there that "if affiliated entities are functionally identical such that bestowing value to one entity equates to giving value to the other, courts have held that funds advanced to one will be equivalent value for a payment made or security interest given by the debtor, effecting a form of consolidation or alter ego analysis." *Id.* (citations omitted).

Findings 40, 41) constitute transfers made without any value received in return; in fact, they were made without any consideration. AHF was insolvent at the time such payments were made. The $771,867 in payments are voidable transfers under § 548(a)(1)(B).

52. The total of $1,348,904 that was paid by AHF to Herring Bank in two payments made on December 27, 2006 and May 13, 2007, respectively, was a return or repayment of the bank's investment in the Amarillo Gardens partnership. (*See* Findings 40, 41). This was an equity investment made at approximately the same time as was the bank's investment in the Barrington-Bell deal. The evidence is insufficient to support a conclusion that such payment was fraudulently made, either actual fraud or constructive fraud.

53. The $316,174 payment made on Barrington-Bell is more than offset by the value of Herring Bank's $1.5 million contribution; and as set forth above, Herring Bank's contribution satisfies the good faith test. In particular, the payment was made in satisfaction of an antecedent debt. *See O'Cheskey v. Koehler (In re Am. Hous. Found.)*, 499 B.R. 517, 540–41 (Bankr. N.D. Tex. 2013); *see also* 5 Collier ¶ 548.04[3][c].

54. The $174,935 payment by AHF to Herring Bank was made in connection with the $2.75 million loan made from Herring Bank to MC-CDC-SA, LLC. *See* Findings 40, 42. Such payment was made without value received in return and was not made in satisfaction of an antecedent debt owed to AHF. AHF was insolvent at the time of the transfer. The payment is a voidable transfer under § 548(a)(1)(B).

55. The $360,000 payment by AHF to Herring Bank was made in connection with the loan on the River Falls transaction. Herring Bank, as set forth, is found to have acted in good faith on this transaction. The $360,000 payment is deemed in partial satisfaction of the $2 million loan made by Herring Bank.

56.     The $18,084 in payments made by AHF to Herring Bank in February 2009 were made on Loan No. 12402 from Herring Bank to AHF. Such payments were made within ninety days of AHF's bankruptcy petition; were made for the benefit of Herring Bank, a creditor of AHF; were made on account of an antecedent debt owed by AHF; and were made while AHF was insolvent. As a result of this payment, Herring Bank would receive more than it would recover were the AHF case a chapter 7 proceeding and the payment was not made. Herring Bank asserted the ordinary course of business defense. The Court will instruct counsel for Herring Bank and the Trustee, within 20 days of issuance of these Findings and Conclusions, to submit a written supplemental argument that directs the Court to the testimony and other evidence that addresses this defense.

## Conclusions

57.     Herring Bank's claim resulting from the Barrington-Bell deal is subordinated. So, too, are all other claims made by Herring Bank that arise from the Barrington-Bell investment. *See* 11 U.S.C. § 510(b); *see also Templeton*, 2013 WL 1316723, *aff'd*, 2014 WL 1599929 (N.D. Tex. Apr. 11, 2014).

58.     Herring Bank's claim that arises from the River Falls transaction is allowed as a general unsecured claim. It is therefore not necessary to address Herring Bank's other claims that arise from the Herring Bank loan to River Falls.

59.     The Trustee is entitled to judgment against Herring Bank for the $771,867 fraudulent transfer made by AHF on the Sterquell notes and the $174,935 fraudulent transfer made on the MC-CDC-SA, LLC loan. Relief is denied on the Trustee's fraudulent transfer claims concerning the $1,348,904 payment made on the Amarillo Gardens investment, the $316,174 payment made on Barrington-Bell, and the $360,000 payment made on River Falls.

60.     On the Trustee's $18,084 preference claim, the Court will consider the parties' supplemental argument on Herring Bank's ordinary course defense.

61.     In light of the Court's rulings, it is not necessary to address the balance of the issues before the Court.

62.     The issues here raise mixed questions of fact and law.  Accordingly, where appropriate, findings of fact may be considered conclusions of law and conclusions of law may be considered findings of fact.

### End of Findings of Fact and Conclusions of Law ###